STATE OF NORTH CAROLINA

COUNTY OF ROWAN

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
19-CVS-2400

| | |
|---|---|
| VELVIE GRAY, GARY HONBARGER, MONICA RANEY, CRYSTAL REESE, NORMAN RICHARD RUFTY, TOMMY ELLIS and VIOLA ELLIS, on their own behalf and on behalf of all others similarly situated, | ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) |
| BLUE CROSS AND BLUE SHIELD OF NORTH CAROLINA, FRANK PAPA, ERWIN BETTE, FTI CONSULTING, INC., and GROUP HEALTH PLAN FOR EMPLOYEES OF DURAFIBER TECHNOLOGIES (DFT) GROUP, INC., | ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

## FIRST AMENDED COMPLAINT – CLASS ACTION

The Plaintiffs, complaining of the Defendants, allege as follows:

### I.  INTRODUCTION.

1.      Plaintiffs bring this action for recovery of damages and for equitable relief arising out of the failure of Defendants Blue Cross and Blue Shield of North Carolina ("Blue Cross" or "BCBSNC"), Frank Papa ("Papa"), Erwin Bette ("Bette"), and FTI Consulting ("FTI") to properly manage, administer and pay claims under Plaintiffs' group health coverage with Durafiber Technologies ("Durafiber"). Seven Durafiber corporate entities filed for Chapter 7 bankruptcy on October 6, 2017, a mere six days after cessation of Blue Cross insurance coverage for most Durafiber employees.

1

2.     As alleged in more detail below, the Plaintiffs were as of July 2017 employed by Durafiber, an industrial fiber producer with pertinent plants in Salisbury and Shelby. Blue Cross provided group health benefits for those workers based on stripped-down coverage under an "Administrative Service Only" or ASO product. Defendants Papa (Durafiber CEO) and Bette (CFO) were looking to minimize costs and shed as many company obligations to the workers as possible via plant closure and bankruptcy. The Blue Cross ASO arrangement would allow them to ignore and avoid paying numerous claims.

3.     Blue Cross was an ERISA[1] functional fiduciary whose name was on the wallet ID cards given to the workers to reflect their coverage. Blue Cross represented to participants that they had coverage but these "covered" claims were not paid. After the upcoming plant closure was announced to workers in July 2017, many began scheduling medical appointments because they had been told that their coverage would end on September 30, 2017. After paying premiums via paycheck deductions for years, Plaintiffs wanted to get the benefit of their coverage while they still had it. But they would ultimately not receive payment on numerous valid medical claims despite the fact that they were covered under the plan. And as late as September 27, 2017, Blue Cross was sending written certifications to employee plan participants expressly assuring them that they were covered through September 30, 2017. At that time Blue Cross had reason to understand that Durafiber was in financial straits as, upon information and belief, Blue Cross already had given multiple warnings to Durafiber based on Durafiber's payment delinquencies. Under all the facts and circumstances, the reasonable action of a fiduciary administrator such as Blue Cross would have been to respond to this information by, for example, obligating the self-

---

[1] The Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*

funding entity to provide adequate assurances of payment for procedures that Blue Cross was pre-qualifying for plan participants.

4. Blue Cross is the largest coverage provider in the State and was being paid to administer the plan competently. Numerous plant workers were advised by Blue Cross that they were covered through September 30, 2017, and, relying on this representation, received medical care before that cutoff date – care plainly covered per their Blue Cross-drafted benefit booklet, via their Blue Cross network providers. After lengthy delays, Blue Cross refused to pay the claims, declaring to aggrieved plan participants that per the Blue Cross ASO contract (which workers never saw), Durafiber had the obligation to fund the plan. That fact did not free Blue Cross from its own duties – including fiduciary duties under ERISA – to provide truthful and accurate claim information to participants, such as whether there were really funds to pay claims.

5. Blue Cross expressly represented to Plaintiffs that they had ongoing medical and related coverage through an end-date of September 30, 2017 based on the Plaintiffs' employment with Durafiber and their enrollment in the group health plan subject to ERISA. Each pay period, the Plaintiffs paid premiums for their group health coverage. Blue Cross was paid significant monies for the period of time in which it assured Plaintiffs that there was coverage. Blue Cross should be ordered to disgorge all such monies.

6. Numerous plant workers and Blue Cross plan participants relied on Blue Cross' assurances and received medical care and treatment including care Blue Cross approved in advance under precertification procedures. However, after lengthy delays, Blue Cross then denied the claims and refused to pay them, disclaiming any responsibility by pointing to Durafiber as the entity expected to self-fund the plan. As a result, the Plaintiffs, who had now also lost their jobs

after Durafiber closed, were barraged by unexpected medical bills and charges. Many have had their credit ratings devastated by no fault of their own.

7. The most basic duty Blue Cross had as the administrator of the group medical plan was to make sure that covered claims were paid. The core purpose of group health benefits is to ensure valid medical claims are paid. While Durafiber had a duty to fund the plan, Blue Cross had its own duty to administer and manage the plan. Blue Cross knew or should have known that Durafiber was failing to make payments and was a corrupt (or nonexistent) "Plan Administrator." Blue Cross continued to administer the plan as if all was well, assuring Plaintiffs they were covered, and never warning them otherwise. Blue Cross breached its duty to competently manage the plan.

8. Defendant Frank Papa was the Chief Executive Officer of Durafiber from March 2015 until October 2017. He signed a form letter provided to plant employees dated July 13, 2017 in which he announced a "possible" closure of the plants in Salisbury, Shelby and Winnsboro. In fact, by that time, closure was certain, and, in fact, by August 25, 2017, he and co-Defendant Bette had already organized the Straterra and Fiber Innovators LLCs to take over the Shelby site.

9. Papa's letter promised "open and honest communication" yet never advised workers of the fact that Durafiber was treating group health benefit claimants like ordinary vendors they could ignore. Defendant Papa's July 13, 2017 letter misrepresented to workers that the coverage cutoff for their group health plan was October 1, 2017.

10. Defendant Erwin Bette was the CFO of Durafiber. While executives at Durafiber, Bette and Papa as noted formed Fiber Innovators International, LLC, a joint venture of Polyquest, Inc. and Straterra Holdings (of which Bette and Papa were managing members), to acquire the

4

Durafiber Shelby/Grover facility after diverting assets away from the benefit plan and sending Durafiber into bankruptcy. Bette and Papa controlled what claims were paid.

11.     Defendant FTI Consulting, Inc. was retained by Sun Capital Partners in or about June 2017 to assume the role of Chief Restructuring Officer, managing vendor relationships, developing a weekly cash flow forecasting model, taking a lead role in general financial and operational strategy, and assisting in the notifications to hourly employees. FTI contributed to cause the failure to pay valid benefit claims of workers receiving medical care under the plan.

## II.     PARTIES.

### A.     Plaintiffs.

12.     **Tommy Ellis** is a citizen and resident of North Carolina who resides at 6785 Long Branch Road, Salisbury, Rowan County. He is a former employee of Durafiber. He was a participant and/or beneficiary in Durafiber's benefit plan at all relevant times including in 2017.

13.     **Viola Ellis** is a citizen and resident of North Carolina who resides at 6785 Long Branch Road, Salisbury, Rowan County. She is married to Mr. Ellis, who is a former employee of Durafiber. She was a participant and/or beneficiary in Durafiber's benefit plan at all relevant times including in 2017.

14.     **Velvie Gray** is a citizen and resident of North Carolina who resides at 4840 Needmore Road, Cleveland, Rowan County. He is a former employee of Durafiber. He was a plan participant in Durafiber's benefit plan at all relevant times including in 2017 and a subscriber under group number 012526, Durafiber Technologies.

15.     **Gary Honbarger** is a citizen and resident of North Carolina who resides at 245 Kings Terrace, Salisbury, Rowan County. He is a former employee of Durafiber. He was a participant in Durafiber's benefit plan at all relevant times including in 2017.

5

16.     **Monica Raney** is a citizen and resident of North Carolina who resides at 298 Falcon Crest Lane, Salisbury, Rowan County. She is a former employee of Durafiber. She was a participant in Durafiber's benefit plan at all relevant times including in 2017.

17.     **Crystal Reese** is a citizen and resident of North Carolina who resides at 153 Wilson Trail, Mocksville, Davie County. She is a former employee of Durafiber. She was a participant in Durafiber's benefit plan at all relevant times including in 2017.

18.     **Norman Richard Rufty** is a citizen and resident of North Carolina who resides at 263 Mr. Henry Road, Mocksville, Davie County. He is a former employee of Durafiber. He was a participant in Durafiber's benefit plan at all relevant times including in 2017.

19.     Each Plaintiff is a participant within the meaning of 29 U.S.C. § 1002(7), and entitled to maintain an action pursuant to 29 U.S.C. §§ 1132(a)(1)(A) & (B), 1132(a)(2) & 1132(a)(3). In the alternative, each Plaintiff has standing to sue for state law claims arising out of the Defendants' acts and omissions.

**B.     Defendants.**

20.     **Blue Cross and Blue Shield of North Carolina**, d/b/a BlueCross BlueShield of North Carolina, is a nonprofit corporation incorporated under the laws of North Carolina and may be served at its registered agent address of c/o 4613 University Drive, Durham, NC 27707, or its address of 1830 US 15-501 North, Chapel Hill NC 27514 which is its principal place of business.

21.     **Frank Papa** on information and belief resides in Cary, North Carolina. He was the "Global Chief Executive Officer" of Durafiber from March 2015 until October 2017. He held executive authority over Durafiber operations and acted in concert with the private equity owners, Sun Capital Partners. He may be served with process at c/o CORE Industrial Partners, 150 N.

6

Riverside Plaza, Suite 2050, Chicago, IL 60606; or, at his residence address at 103 Avenue of the Estates, Cary NC 27518-8608.

22.    **Erwin Bette** on information and belief resides in Mooresville, North Carolina.  He was formerly the Chief Financial Officer of Durafiber.  He may be served with process at c/o Fiber Innovators International, 2525 Blacksburg Rd, Grover, NC 28073, or at his residential address at 128 Seabury Drive, Mooresville NC 28117-6045; or at c/o CORE Industrial Partners, 150 N. Riverside Plaza, Suite 2050, Chicago, IL 60606.

23.    **FTI Consulting, Inc.** ("FTI") is a corporation incorporated under Maryland law and with a principal place of business in Bowie, Maryland.  It may be served with process via its registered agent address, 160 Mine Lake Ct Ste 200, Raleigh, NC 27615-6417, or via its principal office address at 16701 Melford Blvd. Suite 200, Bowie, MD 20715.

24.    The **Group Health Plan for Employees of Durafiber Technologies (DFT) Group, Inc.** is the ERISA benefit plan under which the Plaintiffs were covered as participants and beneficiaries, and may be served with process at 13620 Reese Blvd., Suite 400, Huntersville, NC 28078, or, c/o its administrator, Blue Cross, 4613 University Drive, Durham, NC 27707, or c/o its administrator, Blue Cross, 1830 US 15-501 North, Chapel Hill NC 27514.[2]

---

[2] Various Durafiber entities filed for bankruptcy on October 6, 2017.  *See In re DuraFiber Technologies (DFT) Inc., et al.,* No. 17-12143-CSS and *In Re: DuraFiber Technologies (DFT) Operations, LLC*, No. 17-12148-CSS (D. Del. Bankr., Chapter 7 petitions filed Oct. 6, 2017).  The matters were consolidated under No. 17-12143.  The automatic stay under 11 U.S.C. § 362 does not stay claims against an employee benefit plan. *See Buchanan v. Golden Casting Corp. Hourly Health Benefit Plan,* 2003 U.S. Dist. LEXIS 19879, *10-12 (S.D. Ind. Oct. 10, 2003); *Becker v. Chrysler LLC Health Care Benefits Plan*, No. 09-C-344, 2009 U.S. Dist. LEXIS 83703, 2009 WL 2730337 (E.D. Wisc. Aug. 25, 2009).

7

## III. JURISDICTION AND VENUE.

25. This Court has jurisdiction over this action pursuant to 29 U.S.C. § 1132(e)(1), which provides that state and federal courts have concurrent subject matter jurisdiction over ERISA claims,[3] and subject matter jurisdiction over the state law claims as described below.

26. This Court has personal jurisdiction over all Defendants under 29 U.S.C. § 1132(e)(2) because all Defendants are either residents of the United States or subject to service in the United States, and the Court therefore has personal jurisdiction over them; there is personal jurisdiction over Defendants pursuant to N.C. Gen. Stat. § 1-75.4 and N.C.R. Civ. P. 4.

27. Venue is proper in this Court District pursuant to N.C. Gen. Stat. § 1-75.4 as this is the County in which the Plaintiffs or the Defendants, or any of them, reside.

## IV. CLASS ACTION ALLEGATIONS.

28. Plaintiffs bring this class action pursuant to N.C.R. Civ. P. 23[4] with respect to a putative class defined preliminarily as follow: All persons who were plan participants or beneficiaries under the group health plan identified by Blue Cross as being provided for Durafiber, employer identification number 26-0901514 and/or under group number 012526, as reflected by the member's ID cards issued and provided by Blue Cross.

29. Numerosity: The class is composed of hundreds or thousands of persons geographically dispersed, the joinder of whom in one action is impractical. The class is ascertainable and identifiable from Blue Cross records, data and documents.

---

[3] *See* 29 U.S.C. § 1132(e)(1), which provides: "State courts of competent jurisdiction and district courts of the United States shall have concurrent jurisdiction of actions under paragraphs (1)(B) and (7) of subsection (a) of this section." 29 U.S.C. § 1132(a)(1)(B) states that a plan participant (here, each Plaintiff) may bring a civil suit in order to recover, enforce, or clarify rights to present or future benefits of a benefit plan. *See also Robles v. Combined Ins. Co. of America,* 275 F. Supp. 2d 168, 170-71 (D.P.R. 2003) (noting concurrent jurisdiction).

[4] In the event Defendants seek removal to federal court, Plaintiffs reserve the right to amend their complaint so as to make proper allegations under MDNC LR 23.1 and Fed. R. Civ. P. 23.

8

30.    Commonality:   Questions of law and fact common to the class exist as to all members of the class and predominate over any questions affecting only individual members of the class. These common legal and factual issues include, but are not limited to the following:

a.    Whether ERISA applies to Plaintiffs' disputes with Defendants and pre-empts state law claims, or whether North Carolina state law claims apply to the controversy herein;

b.    Whether each Defendant was a designated or functional fiduciary under ERISA and whether each breached its fiduciary duties under ERISA;

c.    Whether Defendants are liable for representing to Plaintiffs that they had group health medical coverage through September 30, 2017;

d.    Whether Blue Cross represented and warranted that the group health plan provided medical coverage through September 30, 2017, when it did not;

e.    Whether Blue Cross or other Defendants received premiums and fees which should be disgorged and refunded to plan participants who paid for coverage they did not receive;

f.    Whether Defendants intentionally, recklessly or negligently omitted and concealed material facts from their communications and disclosures to Plaintiffs and the other Class members regarding the illegal administration of the plan that caused covered claims to not be paid;

g.    Whether Blue Cross or FTI knew or should have known that the coverage, funding, Plan Administrator and other provisions of the group health plan and ASO contract were being violated by Durafiber and the individual Defendants;

h.    Whether under an ASO model a Blue Cross entity may have liability where the self-funding employer closes and goes into bankruptcy and otherwise valid claims made under group coverage go unpaid;

i.    Whether during the relevant times, the administrator or administrators of the plan were choosing to pay or not pay valid medical claims based on improper factors such as whether the amount of the claim was sufficiently small that it would not divert money from other uses, or, whether the employee was one the company executives wanted to placate and retain in a future restructuring;

j.    Whether, to the extent Defendants did not act in an ERISA fiduciary capacity in managing the plan, or to the extent ERISA or ERISA preemption is inapplicable, they are liable under state-law claims including unfair and

9

deceptive trade practices, negligence, fraud, breach of common-law fiduciary duties, breach of contract, or unjust enrichment;

k.  Whether the Plaintiffs and Class members incurred medical costs that were covered and should have been paid under the plan but were not;

l.  Whether Defendants' alleged misconduct proximately caused otherwise eligible claims by Plaintiffs and Class members (directly or via providers) to go unpaid thereby causing damage to Plaintiffs and Class members;

m.  Whether, as a proximate result of Defendants' alleged unlawful conduct, Plaintiffs and the other Class members have suffered damages; and if so, the appropriate measure of damages to which they are entitled;

n.  Whether Defendants were unjustly enriched, or should otherwise be obligated to disgorge and refund monies received by them; and

o.  Whether, as a result of Defendants' misconduct, Plaintiffs and the other Class members are entitled to equitable relief or injunctive relief, including but not limited to the appointment of an auditor or special master to audit the administration of their claims, or plan reformation or rescission.

31.  Typicality: Plaintiffs' claims are typical of the claims of the other class members. Plaintiffs and the other class members have been injured by the same wrongful practices of Defendants. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the other class members' claims and are based on the same legal theories.

32.  Adequate Representation: Plaintiffs will fully and adequately assert and protect the interests of the other class members. In addition, Plaintiffs have retained class counsel who are experienced and qualified in prosecuting class action cases similar to this one. Neither Plaintiffs nor their attorneys have any interests contrary to or conflicting with other class members' interests.

33.  Predominance and Superiority: This class action is appropriate for certification because questions of law and fact common to the members of the class predominate over questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy, since individual joinder of all members of the

10

36.    As the dominant insurer in North Carolina, BCBSNC has enjoyed supra-competitive prices and inflated premiums or contributions due to lack of market competition, leading it to report a surplus of over $1 billion.[6] The size of its surpluses indicates that it has incurred inadequate risk regarding its coverage products and lacks adequate competition. BCBSNC products allow it to profit unfairly due to the fact that it need not invest in reasonable due diligence or monitor and audit relationships with self-funding partners in ASO plans (as here).

37.    BCBSNC prominently brands its subscriber ID cards, benefit booklets and summary plan descriptions ("SPDs") in a manner that induces consumers to believe they have group health coverage that is stable and solvent via Blue Cross, a near-monopoly player with huge assets, earnings and surpluses. Thus in 2017, the year in which the pertinent events occurred for purposes of this lawsuit, BCBSNC reported financial metrics as follows[7]:

| Financial Results* | 2017 |
|---|---|
| Revenue | $9.4 billion |
| Net Income Ratio | 7.8 percent |
| Consolidated Net Income (Loss) | $734.0 million |
| Taxes (Federal, State, Local) | $511.5 million |
| Claims and Medical Expenses (insured) | $6.6 billion |
| Months in Reserve | 4.4 months in reserve |
| Membership (including Blue Card®) | 3.81 million |

*Financial results, excluding months in reserve are GAAP results.

---

[6] See https://advocacy.consumerreports.org/wp-content/uploads/2014/04/surplus_report.pdf.
[7]    See    http://mediacenter.bcbsnc.com/news/market-uncertainty-drives-higher-than-expected-financial-results-for-blue-cross-nc-in-2017.

12

38.     The size and power of Blue Cross is widely known and imprinted in the consumer consciousness. And Blue Cross chose to likewise brand its ID cards as follows:



39.     From the face of this Blue Cross ID card, the insured would have no reason to believe that the financial soundness of his group health coverage was controlled not by Blue Cross but rather the "Plan Administrator"[8] in Durafiber's miniscule[9] human resources department.

40.     Another effect of its market dominance in the State is that Blue Cross is prone to periodically treating individual subscribers or entire groups in a careless and negligent manner, because it lacks competitors or thin profit margin to sharpen its competence. Blue Cross received multi-million-dollar fines in that regard as recently as 2016. Specifically, the NCDOI levied a record $3.6 million fine against Blue Cross on September 15, 2016 after nearly 3,500 consumers

---

[8] A BCBSNC invoice dated June 11, 2017 identified the Durafiber "Administrator" as "Tresa O'Connor." In 2016 bills, BCBSNC listed the administrator as Rick Spurlock. The 2017 BCBSNC plan changes ASO agreement for Durafiber stated that the plan administrator was Durafiber, attention Jennifer Simpson, Human Resources.
[9] According to slide presentations Durafiber executives were making in 2016-17 touting cost-cutting efforts, the total number of corporate employees in the Durafiber Human Resources Department was two (2) people.

13

and medical providers made complaints that it was delaying reimbursements, failing to confirm coverage and canceling coverage improperly.[10]

41.     Blue Cross Blue Cross reported net income of $734 million in 2017 and revenues in excess of $9.4 billion in 2017 and $9.9 billion in 2018. Durafiber in 2017 had $337 million in revenues. Based on revenues, BCBSNC is over 25 times larger than Durafiber. BCBSNC is ubiquitously known in North Carolina as an insurance provider. Durafiber has no expertise in insurance. Yet, BCBSNC casts itself as being the minimal "administrative service provider" compared to Durafiber's "Plan Administrator" role in the subject group insurance plan.

42.     While it markets itself to the insurance-consuming public as a comprehensive coverage provider that is far too large to raise concerns about it not being able to pay claims, Blue Cross has in recent years sought to offer stripped-down "administrative services only" products. In the ASO model, Blue Cross purports to provide merely limited "administrative" services – so limited that it claims that the employer, not itself, is the sole "plan administrator" under ERISA.

43.     The unwitting employee is given a proof of coverage ID card that looks like any other Blue Cross insurance card. Yet, in truth, Blue Cross ultimately does not fund the benefits; rather, the employer does so under a "self-funding" arrangement. The ordinary worker is not aware that if the employer goes out of business, the worker may be left facing mountainous medical bills. Under such circumstances, Blue Cross has a duty to take reasonable steps to ensure that the benefits it is purporting to manage are real and not illusory and ensure that plan participants have clear disclosure to them of the true nature of Blue Cross' role.

---

[10] *See* Voluntary Settlement Agreement between Blue Cross and Comm'r of Insurance Wayne Goodwin dated September 15, 2016; https://www.newsobserver.com/news/business/article102021212.html.

14

## B.   Further facts on Durafiber and its arrangements with Blue Cross.

44.   Each of the Plaintiffs worked at the Salisbury facility located on Highway 70 West, at 7401 Statesville Boulevard in Rowan County. This sprawling site since opening in the 1960s traditionally produced polyester fibers and fabrics production for industrial and commercial uses. Some of the uses for such industrial fibers can be for conveyor belts, hoses, single ply roofing, tents, automotive airbags, seat belts, safety harnesses and ropes.

45.   Over the years, the site changed its name multiple times. When it first opened in or about May of 1966, the facility went under the name of Fiber Industries Incorporated, a joint venture between Celanese and Imperial Chemicals Incorporated. In 1982, Celanese bought out Imperial Chemicals' interest. Then Hoechst AG acquired Celanese, merging with American Hoechst and becoming Hoechst Celanese Corporation in 1988. For a period of time, the site was known by the name of Kosa, and then under the name of Invista starting in 2004. Two years later, Invista sold its parts of its enterprise including its polyester tire and technical filament business, to Performance Fibers Inc. The facility was renamed Performance Fibers Operations. Finally, the site changed names again and became known as Durafiber Technologies in 2014.

46.   For a time after switching to the Durafiber name, plant operations seemed to go on as before. In fact, Durafiber was controlled by private equity firm Sun Capital. Sun Capital has a specialty in targeting other business so as to acquire them, strip assets, use bankruptcy proceedings to move debts, and restructure and profit off the process.[11]

---

[11] *E.g., Sun Capital Partners III, LP v. New England Teamsters & Trucking Industry Pension Fund,* 903 F. Supp. 2d 107, 109-11 (D. Mass. 2012) ("Sun Capital Advisors, Inc. is a private investment firm founded by Marc Leder and Rodger Krouse specializing in leveraged buyouts and other investments in underperforming, market-leading companies."), *aff'd in part, vacated in part, rev'd in part by Sun Capital Partners, III LP v. New England Teamsters & Trucking Industry Pension Fund,* 724 F.3d 129 (1st Cir. 2013) (finding that private equity firm may have liability for underfunded pension plans of portfolio companies); *and see subsequent op. at Sun Capital Partners III, LP v. New Eng. Teamsters & Trucking Indus. Pension Fund,* 172 F. Supp. 3d 447, 450 (D. Mass. 2016) ("This case addresses whether the [Sun

15

47.     None of the Plaintiffs knew that Durafiber and its top executives were planning to manipulate assets and liabilities so as to leave the ordinary workers holding the bag and facing ruinous medical expenses because Durafiber refused to self-fund the benefits plan.

48.     Nor did they know that Blue Cross was failing to conduct adequate due diligence, review, investigation, monitoring and auditing of Durafiber so as to ensure that Blue Cross was making truthful and reliable representations when it affirmed to workers that they had coverage in accordance with their benefit booklet through and including September 30, 2017.

49.     On July 12, 2017, employees like Mr. Rufty received a letter signed by Durafiber Vice President David Ascher stating that the company had developed "tentative plans to shut down the facility." Mr. Rufty then received a company letter dated July 13, 2017 signed by Defendant Frank Papa, the Chief Executive Officer, which stated that the "possible closure" could occur "at the end of a 60-day transition period on September 11, 2017." That letter added that under the Workers Adjustment and Retraining Notification (WARN) Act, the worker had to "be paid for at least the next 60 days." When the Plaintiffs received their paychecks over that time, the same deduction of insurance premiums was found as before.

50.     The July 13 letter stated that the plants set to close were those in Salisbury, Shelby, and Winnsboro. It reiterated that the closure date would be "at the end of a 60-day transition period on September 11, 2017." The July 13 letter also included a "frequently asked questions" section which promised at number 9 that "If the plants close, the affected employees will be responsible for their own insurance as of October 1, 2017." This representation led workers to believe that their Blue Cross coverage continued until the end of September 2017 – and that any expenses

---

Capital] private equity funds … may be held liable under the Multiemployer Pension Plan Amendments Act … for the pro rata share of unfunded vested benefits owed to a multiemployer pension fund by a bankrupt company, Scott Brass, Inc. …, that is owned by the funds.").

incurred for medical care, treatment or medications allowed by the benefits booklet would be timely paid by the plan to providers.

51.    As the administrator of the group health benefits, Blue Cross knew or should have known that its partner in that arrangement, Durafiber, was making such representations to its employees who were the plan participants.

52.    While the Plaintiffs were not parties to the contract between Blue Cross and their employer, and never saw the contract, even if it applied to them it would not bar their claims. BCBSNC entered into an "Administrative Services Agreement" ("ASA") with "Performance Fibers" (later Durafiber) electronically signed on February 13, 2013. It is a generic form agreement drafted by BCBS. It states that "Plan Sponsor, Plan Administrator and the Group Health Plan wish to contract with BCBSNC to perform certain services with respect to the administration of the Group Health Plan." ASA, p. 1. The confusion between the roles of the named "Plan Administrator" and the actor or actors who will perform "services with respect to the administration" is evident.[12]

53.    The agreement purported to cast the employer as the Plan Sponsor and the Plan Administrator. On information and belief, Blue Cross failed to engage in any due diligence or audit to confirm that Durafiber could indeed competently function in those roles. Nonetheless, Blue Cross agreed and admitted that it would be paid "Administrative Fees" for "certain administrative services" it would perform under the agreement. ASA § 1.1. Blue Cross would

_____

[12] The Agreement states that Blue Cross was acting "pursuant to the authority granted under N.C.G.S. § 58-65-135 and subject to its limitations." Agreement, p. 1 However, BCBS was also acting pursuant to ERISA and subject to other applicable law as well. While N.C. Gen. Stat. § 58-65-135 purports to provide that a corporation organized for purposes of "administering such a plan shall have no liability to the subscribers or to the hospitals for the success or failure, liquidation or dissolution of such group hospitalization or medical and/or dental service plan," it does not operate to exculpate BCBSNC from liability due to its failure to act reasonably and satisfy its fiduciary duties in administering and managing the plan and communicating with plan participants.

17

prepare and provide the "Benefit Booklets" (i.e., the SPDs under ERISA[13]). ASA § 1.5. While Blue Cross sought to identify the employer as the "Plan Administrator," it admitted that what the SPD would show was "a description of the benefits to be <u>administered by BCBSNC</u> under this Agreement." ASA § 1.5 (emphasis added).

54.     Blue Cross would receive a "Care Management Fee" which meant "a cost associated with management of health care which may vary month-to-month depending on managed care programs and the number of Members." ASA § 1.7. Blue Cross would also receive "Miscellaneous Fees" in addition to the "Administrative Fees" and "Claims Expense" that might be paid. ASA § 1.20. It was Blue Cross, not the employer, who arranged for the "Participating Blue Plan" which meant the "Blue Cross or Blue Shield Plan with which BCBSNC has made arrangements for access by Members to such Blue Cross or Blue Shield Plan's network of Providers and/or which participates in the BlueCard Program." ASA § 1.24.

55.     Under the ASA, "BCBSNC represents and warrants, and Plan Sponsor and Plan Administrator acknowledge and agree, that BCBSNC is not an insurer or underwriter of the Group Health Plan and that BCBSNC does not have any fiduciary responsibility with respect to the Group Health Plan, except as may be expressly delegated to BCBSNC pursuant to this Agreement. Notwithstanding, Performance Fibers Plan Sponsor and Plan Administrator acknowledge and agree that BCBSNC shall have authority with respect to the structure, payment terms, and other contract terms in connection with its Provider networks." ASA § 2.4. In this regard, courts apply a functional approach to discerning the ERISA fiduciary duties that parties in a plan take on, and semantic distinctions between a "plan administrator," "claims administrator" or provider of

---

[13] Thus, the agreement later states that the content of the "Benefit Booklet(s)" must be "identical" to the material content of any separate "summary plan description for the Group Health Plan, as that term is defined in Section 102 of ERISA." ASA § 2.3.

Case 1:19-cv-01234-WO-LPA   Document 3   Filed 12/18/19   Page 17 of 59

"certain administrative services" will not insulate a party like Blue Cross from application of ERISA fiduciary duties if its actual functional role in implementing the benefit plan warrants a finding that fiduciary duties apply.[14]

56. Under the agreement, Blue Cross had the ability to review the ability of Durafiber to self-fund and pay claims: "At BCBSNC's request, Plan Sponsor shall provide BCBSNC with relevant financial information about Plan Sponsor sufficient to permit BCBSNC to determine whether Plan Sponsor can meet its financial obligations under this Agreement." ASA § 3.3 (emphasis added). On information and belief, Blue Cross had a duty to make such a request and failed to adequately determine whether it should be pre-certifying costly medical care for workers who were ill-equipped to pay for it in the event the plan failed.

57. Regarding division of administrative duties, the agreement stated: "The Plan Administrator has the discretionary authority to administer the Group Health Plan, including the authority to make determinations in the administration of the Group Health Plan, including, without limitation, determinations concerning eligibility for benefits; coverage of services, care, treatment, or supplies; and/or reasonableness of charges; and such determinations shall be final and conclusive. Prior to the Effective Date, Plan Administrator will take such internal action as is necessary to delegate to BCBSNC the authority to make discretionary decisions, as required by this Agreement, including, without limitation, the discretion to make determinations regarding claims for benefits as described in Article 7 of this Agreement." ASA § 4.2 (emphasis added).

---

[14] *E.g., Guardsmark Inc. v. Blue Cross and Blue Shield of Tennessee*, 2001 WL 1352231 (W.D. Tenn., Oct. 19, 2001) (in which an employer's breach of fiduciary duty claim against an insurer under an administrative services only (ASO) contract were not dismissed at summary judgment, even though the insurer was not named as a fiduciary in the plan documents, because as a functional matter the insurer exercised discretion in managing plan assets and maintaining plan records, and so, was liable under ERISA as a "functional fiduciary"); *Savoie v. Blue Cross Blue Shield of Ala.,* 2005 U.S. Dist. LEXIS 102, *6-9, 2005 WL 22948 (E.D. La. Jan. 4, 2005) (finding that issue of fact existed as to whether Blue Cross entity had ERISA fiduciary duties despite the fact that it tried to claim it was only performing "administrative services only").

This was an admission that Blue Cross did have discretionary authority which also means, the functional status of an ERISA fiduciary.

58.    "BCBSNC shall produce ID cards for Members using standard ID card design and distribute to Members in accordance with BCBSNC Guidelines." ASA § 5.3. Workers had a Blue Cross ID card prominently featuring the Blue Cross logo and branding. They trusted that Blue Cross was administering their plan. They did not expect that Blue Cross would precertify costly procedures when the plan would not pay the costs even though the plan plainly covered the care.

59.    "BCBSNC shall receive and process such applications or other forms or statements completed and submitted by potential Members as BCBSNC may reasonably determine to be necessary for enrollment or coverage under the Group Health Plan." ASA § 5.4. Again, Blue Cross' role as point of contact reinforced participants' belief that they were working with Blue Cross – not some "Plan Administrator" in Durafiber's two-person HR department – it was BCBSNC to whom they sent applications for coverage.

60.    It was Blue Cross who maintained the list of "Participating Providers." It was Blue Cross that maintained the internet website that workers used up to learn what providers they could go to: "BCBSNC shall also maintain a Provider directory that is available on an internet website and is updated no less frequently than weekly." ASA § 5.5. It was Blue Cross who would "make available an electronic version of the Benefit Booklet(s) … on an internet website in a PDF format." ASA § 5.6.

61.    The ASA stated that the "Plan Sponsor," i.e. the employer, "shall indemnify and hold harmless BCBSNC for any loss, liability, damage, expense, settlement, cost or obligation (including reasonable attorney's fees) from any resulting assessments, penalties and/or regulatory charges … incurred or paid by BCBSNC related to the failure of Plan Sponsor and Plan

20

Administrator to provide such SBCs or notices of material modification as required by law." ASA § 5.7. Here, Blue Cross should be required to pay claims and seek indemnification from the other Defendants.

62.     In addition to not receiving timely payment for their proper medical claims, Plaintiffs and other plan participants on information and believe have likewise have not received all coverage under the group plan for their prescription medication expenses.  In this regard, Blue Cross' agreement with the employer reflects the scope of Blue Cross' involvement: "BCBSNC shall provide or arrange for the provision of pharmaceutical management services for the Group Health Plan's prescription drug benefit. Members shall be permitted to access prescription drug benefits by presenting their ID cards to participating network pharmacies. Claims for prescription drug benefits shall be processed electronically and Members shall be responsible for any copayments, deductible, or coinsurance amount required under the Group Health Plan. Members who receive prescription drugs from nonparticipating pharmacies shall be responsible for paying the pharmacy and submitting a proof of drug claim to BCBSNC or BCBSNC's pharmacy management vendor for processing, and BCBSNC shall pay benefits for Covered Services to the Member." ASA § 5.10 (emphasis added).  Thus, it was Blue Cross who was obligated to provide or arrange for prescription "management services."  Blue Cross breached its duty to properly perform that "management" by allowing plan participants to run up voluminous drug charges that Blue Cross knew or should have known would not be paid although they were covered.  As even this form ASA agreement that Blue Cross drafted provided, providing competent pharmacy management meant that Blue Cross "shall pay" covered benefits.

63.     The agreement elsewhere represents that Blue Cross will "administer" the benefits plan notwithstanding its efforts to characterize its role as less than that. *See* ASA § 6.1 ("The

Benefit Booklet(s) shall describe the benefits <u>to be administered by</u> BCBSNC pursuant to this Agreement….") (emphasis added). Likewise, under Section 7.1, "BCBSNC shall provide administrative services under this Agreement, including processing claims and appeals filed by or on behalf of Members for Group Health Plan benefits to the extent described in this Article and in accordance with its reasonable understanding of the terms of the Group Health Plan as reflected in the Benefit Booklet(s)." ASA § 7.1.

64.     Under Section 7.2(a), BCBSNC "shall" provide "services" including to "[c]alculate benefits, prepare checks and communicate through existing systems and in accordance with established procedures and processes." ASA § 7.2(a). Here, Blue Cross breached its own policies and procedures and its duties relative to the insured and plan participants by failing to communicate to them the true status of the plan and failing to ensure that eligible claims were paid under proper rules and procedures. Further, Blue Cross had a duty to "[i]nvestigate claims as necessary." ASA § 7.2(c). Yet it failed to perform investigation, audit or due diligence to ensure a viable, paying plan. Blue Cross had a duty to "[d]iscuss claims, where appropriate, with Providers," yet failed to advise medical providers, for example during precertification, that the funds might not be there to pay the claim. ASA § 7.2(d). It was to "[p]erform internal audits of claim payments on a random sample basis," ASA § 7.2(e), yet failed to audit to ensure claims would be paid. Blue Cross was to "[p]rovide claims department consultation as necessary with its health care and legal consultants in handling claims." ASA § 7.2(h). Blue Cross had ample resources to provide the consultation and detect the lack of plan funding prior to when the plan coverage ended on October 1, 2017.

65.     ASA Section 7.3(a), pertaining to fiduciary duties, provides: "In processing claims, BCBSNC <u>shall be responsible for making the decision to allow or deny all initial claims for benefits</u> that are filed by Members and for notifying each Member of the decision regarding the

22

claim, consistent with the terms of this Agreement and Section 503 of ERISA. BCBSNC <u>shall</u> <u>also be responsible</u> for making the decision to allow or deny all appeals of denied claims for benefits and for notifying each Member of the decision regarding the appeal, consistent with the terms of this Agreement and Section 503 of ERISA. In making the decisions regarding claims for benefits and appeals of denied claims, as described in this paragraph, <u>BCBSNC shall have</u> <u>discretionary authority to construe and interpret the terms of the Group Health Plan and to</u> <u>determine whether a claim is properly payable under the Group Health Plan</u>." The highlighted language clearly reflects a functional fiduciary status. Blue Cross also stated that "[i]n providing the services described in this Agreement, BCBSNC may apply its standard practices, policies and procedures used in its insured business…." ASA § 7.4. Its standard policies, when administering normal insurance coverage products it provides, include making sure there are funds to pay claims.

66.     The ASA states that "BCBSNC shall process the payment of claims for benefits under this Agreement and maintain the Security Amount through its general claims account" but that the "Plan Sponsor acknowledges that it has the ultimate payment obligation with respect to claims for benefits processed under this Agreement." ASA § 9.1. Under the circumstances, Blue Cross was obligated to pay the relevant claims from its account and take upon itself the responsibility to them seek indemnification from others.[15]

---

[15] The agreement also states the following as to the "Bankruptcy of Plan Sponsor": "Notwithstanding any other provision of this Agreement, including any exhibit to this Agreement, in the event of the filing by or against Plan Sponsor of a petition for relief under the Federal Bankruptcy Code, BCBSNC shall have the right to suspend the payment of claims for Group Health Plan benefits unless and until an order is obtained from the bankruptcy court, in form and substance acceptable to BCBSNC, authorizing such payment and Plan Sponsor has deposited the funds necessary to pay such claims in full." ASA § 9.5. This contractual term cannot overcome Blue Cross' duties imposed upon it by ERISA and/or state common and statutory law. The Plaintiff were not parties to this agreement between Blue Cross and Durafiber. Further, Section 10.2 appears to contemplate that due to the bankruptcy of a plan sponsor, Blue Cross may incur additional expenses and costs it may not otherwise have to pay. Here, the damages and/or funds subject to equitable relief reflect "reasonable increased costs and expenses" that should be "incurred by BCBSNC in providing services" and that were related to the fact that the Plan Sponsor went into "bankruptcy." ASA § 10.2.

Case 1:19-cv-01234-WO-LPA   Document 3   Filed 12/18/19   Page 22 of 59

67.     The agreement further provides that "BCBSNC shall indemnify and hold harmless" the Plan Sponsor for any loss caused "by BCBSNC's willful misconduct, criminal conduct, gross negligence, fraud or breach of fiduciary responsibility." ASA § 12.1.  In this respect, clearly Blue Cross acknowledges that it may be liable for claims in that regard should the facts so support.

68.     Blue Cross provided a "benefit booklet" purporting to summarize the plan for the participants.  In fact, a substantial number of the participants never received or saw the booklet.  It stated that "[t]his benefit booklet describes the DURAFIBER TECHNOLOGIES (DFT) GROUP, INC. EMPLOYEE health plan (the PLAN).  Blue Cross and Blue Shield of North Carolina provides administrative claims <u>payment</u> services only and <u>does not assume any financial risk or obligation with respect to claims</u>."  (Emphasis added).  This statement is both confusing, ambiguous, and void to the extent it conflicts with Blue Cross' fiduciary duties under ERISA and its duties under the common law.  Blue Cross had a duty to perform its role under the plan truthfully and competently.  Plaintiffs allege that under the circumstances herein, Blue Cross did not do so.  Blue Cross if it breached its administrative or fiduciary duties **did** as a matter of law assume a "financial risk or obligation with respect to claims."

69.     The benefit booklet recites that "[t]he benefit plan described in this booklet is an EMPLOYEE health benefit plan, subject to the Employee Retirement Income Security Act of 1974 (ERISA) and the Health Insurance Portability and Accountability Act of 1996 (HIPAA). A summary of benefits, conditions, limitations and exclusions is set forth in this benefit booklet for easy reference. In the event of a conflict between this benefit booklet and the terms in the PLAN document, the PLAN document will control."  The last sentence is misleading.[16]

---

[16] In fact, under Fourth Circuit law, if the summary plan description (here, the "benefit booklet") conflicts with the formal main plan document and this prejudices the workers, whichever document is more favorable to them will control.  The rule in the Fourth Circuit is that the SPD controls over the conflicting Plan

70. The benefit booklet states that "the PLAN SPONSOR reserves the right to terminate the PLAN at any time with respect to its EMPLOYEES by a written instrument signed by an officer of the PLAN SPONSOR. Such termination may be made without the consent of the MEMBERS, or any other persons. The PLAN SPONSOR also reserves the right to amend the PLAN, including reduction or elimination of benefits or COVERED SERVICES. Amendments shall be made only in accordance with the provisions of the PLAN. The PLAN ADMINISTRATOR will provide notice to MEMBERS within sixty days of the adoption of any amendment that results in a material reduction in COVERED SERVICES or benefits."

71. Here, on information and belief Defendants Papa, Bette and FTI terminated the plan, amended the plan and/or reduced or eliminated benefits under the plan without executing proper written instruments or following either plan or ERISA prerequisites. Blue Cross was aware or should have known of this state of affairs due to the fact that in the time period from July onward in 2017, they were choosing to tell Blue Cross to pay some claims but not others, selectively putting off the payment of larger claims while allowing Blue Cross to reimburse smaller ones, and

---

provision where the SPD favors the participant. *See George v. Duke Energy Ret. Cash Balance Plan*, 560 F.Supp.2d 444, 468 (D.S.C. 2008), citing *Martin v. Am. Bancorporation Ret. Plan*, 407 F.3d 643, 648 n.13 (4th Cir. 2005) (noting that "representations in a SPD control over inconsistent provisions in an official plan document"); *Glocker v. W.R. Grace & Co.*, 974 F.2d 540, 542-43 (4th Cir. 1992). *See also Benton v. Westinghouse Savannah River Co., LLC*, 2002 U.S. Dist. LEXIS 27807, 28 *18 at n.12 (D.S.C. Sept. 24, 2002) ("Various cases have allowed plan participants to rely on the more generous of the SPD or Plan language."); *Paulson v. Paul Revere Life Ins. Co.*, 323 F. Supp. 2d 919, 939 (S.D. Iowa 2004) ("Just as the rule allowing enforcement of SPDs helps to ensure that policy summaries are sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan, so does a rule requiring that favorable policy terms be enforced over more restrictive terms in an SPD." (Internal quote marks omitted)); *Springs Valley Bank & Trust Co. v. Carpenter*, 885 F. Supp. 1131, 1141-42 (S.D. Ind.1993) (finding that "in cases of conflict between a summary plan description and a policy, the terms which favor the participant will govern"); and *cf. Gable v. Sweetheart Cup Co., Inc.*, 1994 WL 534903, *2 (D. Md. Jan. 14, 1994) ("If ambiguities remain, the Plan should be construed against the drafter." (quoting *Glocker, supra*)).

25

preferentially having medical claims regarding workers Papa and Bette needed for the Shelby plant in the future while not paying those of Salisbury workers.

72. The benefit booklet/SPD represents in multiple places that plan participants will have coverage and only have to pay noncovered expenses. See booklet p. 13, stating that for in-network care, "If the billed amount for COVERED SERVICES is greater than the ALLOWED AMOUNT, you are not responsible for the difference. You only pay any applicable deductible, coinsurance, and noncovered expenses." Likewise at page 16: "Care you receive as part of an OFFICE VISIT, electronic visit, telemedicine, or house call is covered, except as otherwise noted in this benefit booklet." And: "Under federal law, you can receive certain covered PREVENTIVE CARE services from an IN-NETWORK PROVIDER in an office-based, outpatient, or ambulatory surgical setting, or URGENT CARE center, at no cost to you." (Booklet, p. 16). "Maternity care benefits, including prenatal care, labor and delivery and post-delivery care, are available to all female MEMBERS." (Booklet, p. 20). "Benefits are provided for … Outpatient services received in a HOSPITAL, a HOSPITAL-based facility, NONHOSPITAL FACILITY or a HOSPITAL-based or OUTPATIENT CLINIC." (Booklet, p. 22). "Surgical services by a professional or facility PROVIDER on an inpatient or outpatient basis, including pre-operative and post-operative care and care of complications, are covered." (Booklet, p. 26).

73. The booklet instructs that "Your ID CARD identifies you as a Blue Options HSA MEMBER. Be sure to carry your ID CARD with you at all times and present it each time you seek health care." (Booklet p. 14). It instructs participants to obtain pre-certification: "Certain services require PRIOR REVIEW and CERTIFICATION in order for you to avoid a full denial of benefits. General categories of services are noted below as requiring PRIOR REVIEW … visit BCBSNC's

website at BlueConnectNC.com or call BCBSNC Customer Service to ask whether a specific service requires PRIOR REVIEW and CERTIFICATION." (Booklet, p. 16).

74. At page 36, "WHAT IS NOT COVERED?" there is no statement that warns the participants that medical treatment may not be covered if the employer simply decides it does not want to pay a claim. The booklet does not say care is excluded from coverage if the company that Blue Cross contracts with would simply prefer to pay a different claim by another worker who happens to work at the Shelby plant, which the executives plan to acquire after a bankruptcy.

75. The booklet says that medical care is not covered where it consists of "Services received either before or after the coverage period of the PLAN...." (Booklet, p. 36). Thus, by corollary, service received before the October 1, 2017 cut-off were covered. The booklet expressly states that plan participants have "the right to receive payment under the PLAN." (Booklet, p. 53).

76. The booklet provides that "BCBSNC has the authority to use its discretion to make reasonable determinations in the administration of coverage. These determinations will be final. Such determinations include decisions concerning coverage of services, care, treatment or supplies, and reasonableness of charges. BCBSNC medical policies are guides considered when making coverage determinations." (Booklet, p. 53). This discretionary language indicates Blue Cross is an ERISA fiduciary.

77. One or more Plaintiffs received a "Certification of Health Insurance Coverage" printed on Blue Cross letterhead dated September 27, 2017 and that gave the "date coverage ended" as "09/30/2017." It said "IMPORTANT – KEEP THIS CERTIFICATE" – in other words, by design, it was meant to be relied on. This is the top part of the certificate Blue Cross provided:

27



**BlueCross BlueShield**
**of North Carolina**

S14

CERTIFICATION OF HEALTH INSURANCE COVERAGE

████████████████

SALISBURY, NC 28146

Subscriber ID: ██████████          09/27/17

IMPORTANT - KEEP THIS CERTIFICATE. This certificate is evidence of your coverage under this plan. Under a federal law known as HIPAA, you may need evidence of your coverage to help you get special enrollment in another plan.

| MEMBER NAME | DATE COVERAGE BEGAN* | DATE COVERAGE ENDED |
|---|---|---|
| ████████████ | 03/31/2016 | 09/30/2017 |

*"Date Coverage Began" only reflects the start date of your most recent group coverage specified below. You may have had other Blue Cross Blue Shield of North Carolina group coverage that is not reflected in this Certificate.

Most recent group coverage:

012526     DURAFIBER TECHNOLOGIES

78.    Prior to certifying to the participant that he or she had coverage through September 30, Blue Cross had a duty to take reasonable due-diligence steps to verify that indeed, there was such coverage, in the common-sense meaning of that term: i.e., that if the insured received medical care defined by this benefits booklet as being covered, the costs of that care would be paid and Blue Cross would see to that payment occurring.

79.    The certificate said it "is evidence of your coverage under this plan." It represented that the participant had "Blue Cross Blue Shield of North Carolina group coverage" via "Durafiber

28

Technologies." And concluded, "Thank you for placing your trust and confidence in Blue Cross and Blue Shield of North Carolina. We hope to have the opportunity to serve you in the future":

> For questions about this form, please call the Customer Services Department toll free at 1-877-275-9787, starting at 8 a.m., Monday through Friday, EST.
>
> Thank you for placing your trust and confidence in Blue Cross and Blue Shield of North Carolina. We hope to have the opportunity to serve you in the future.

80. That phone number remains the Blue Cross contact number to this day.[17]

### C. Durafiber closes and Blue Cross fails to pay.

81. *Facts regarding Plaintiff Norman Richard Rufty* -- Mr. Rufty remembers the exact date he started at the plant, on September 7, 1976. He worked rotating shifts that required him to go to work in the middle of the night, and twelve-hour shifts. After years working on the plant floor in "spin draw" and other departments, Mr. Rufty went into maintenance and became a maintenance planner scheduler.

82. From September 7, 1976, up through his last day of work on September 12, 2017 – a period of 41 years and five days – Mr. Rufty had part of his gross pay deducted every pay period as his premium for his health insurance.

83. On September 8, 2017, Mr. Rufty received a memo from Durafiber which stated that "Your Medical, Dental, and/or Vision coverage will end as of *September 30, 2017*" (bold italics in original). Accordingly, Mr. Rufty reasonably believed he had health insurance coverage through September 30, 2017. And, he knew that his coverage was with Blue Cross. Each year he received a new enrollment card for his Blue Cross benefits that he put in his wallet. His card for

---

[17] See website at http://www.bcbsnc.com/content/snyderslance/index.htm.

2017 had the Blue Cross/Blue Shield logo at the top left, prominently said "BlueCross BlueShield" and "BlueOptions," and also stated "DuraFiber Technologies" on it.

84.     With September 30, 2017 approaching, Mr. Rufty relied on the representations of Blue Cross and received a medical procedure on September 17, 2017. He had previously had a similar procedure approximately two years earlier. That procedure had been covered by his group medical insurance through his employment and his medical expenses were paid by the coverage. However, after he received new procedure on September 17, 2017, over the weeks and months that followed, Mr. Rufty realized that something was seriously wrong. Blue Cross was failing to pay on the medical claim.

85.     Now, he is receiving calls and letters from collection agencies. Blue Cross – a company that expressly represented to employees that coverage ran through the end of September 2017 – will not provide the coverage to which he is entitled for this medical claim.

86.     ***Facts regarding Plaintiff Velvie Gray*** -- Mr. Gray was born in 1958. He went to work at the Salisbury plant in 1978. Over the years that followed, Mr. Gray supported his family through his employment.

87.     When Mr. Gray first started at the plant, he performed work duties including working in "packout," driving a "tugger," and delivering industrial quality yarn around the plant departments. Years later, he moved to the "spin draw" department that performed part of the manufacturing process for the yarn. Around 1984-85, he went into a maintenance position.

88.     When he first began at the plant, he rotated through shifts. For example, first he would work from 7 a.m. to 3 p.m. for seven days, then have two days off. Then, he would work from 3 p.m. to 11 p.m. for seven more days, then have days off. Then he would work the night shift running from 11 p.m. to 7 a.m. in the morning. At a later phase at the plant, Mr. Gray and

30

others would work a 12-hour shift, from 7 a.m. to 7 p.m. each day, or from 7 p.m. to 7 a.m. Finally, more recently while working in maintenance, his shift would run from 6:30 a.m. to 3:30 p.m.

89. The work could be physically demanding, and often would require constant attention. His hours are representative for other Plaintiffs and employees. He continued working at the plant all the way through the plant closure on September 12, 2017.

90. Over those 39 years, the medical coverage premiums were taken out of his paycheck. He reasonably trusted that the premiums were being used to fund coverage and pay claims and was never told otherwise.

91. In the weeks and months leading up to the September 30, 2017 end date for medical coverage, Mr. Gray had a medical procedure at Iredell Memorial Hospital on August 21, 2017. He was in the hospital until August 23, 2017.

92. He incurred medical expenses exceeding $60,000. When payment of those medical costs was late in occurring, he made inquiries to the health care providers. He was told that the hospital had submitted the bill to Blue Cross. However, Blue Cross was denying the claim.

93. Even after the self-pay discount that the hospital gave him of approximately $43,000, Mr. Gray still owed over $18,000. He has had to make monthly payments on that debt.

94. The costs that Blue Cross has failed to pay have also included ones arising out of Mr. Gray's prescription drug coverage. Blue Cross has refused to pay the charges associated with his medications. It has also refused to cover the costs of his physical therapy.

95. Mr. Gray heard about the upcoming plant closure when he returned from his normal July 4 holiday annual vacation. The plant held a meeting in July 2017 right after he came back from his vacation. They met in the break room and the supervisor informed him and the other workers of the plans to close the plant.

31

96.    Mr. Gray had been putting off a procedure his physician recommended. If he had known that his coverage with Blue Cross would not be honored, then he would have obtained the procedure at another time. Blue Cross as a large, experienced and sophisticated benefits provider knew that when the workers learned that the plant they had worked at for decades was going to close down, and that their medical benefits would only last through September 30, 2017, they would seek to get medical care and procedures before they lost their coverage.

97.    Blue Cross was the insurance company whose name and logo was on the annually issued coverage wallet ID card, and represented in writing to workers that they had coverage with Blue Cross through the end of September 2017. Mr. Gray could not understand why his claim would not be covered.

98.    When Mr. Gray kept receiving hospital bills, he made inquiries with the hospital. The hospital staff told him to call Blue Cross. Mr. Gray took out his wallet card with the Blue Cross information and did so. He explained that he had coverage for the medical care and had received the care while coverage was ongoing. Blue Cross's representative advised him that Blue Cross would not honor the claim because Durafiber never sent them money to pay the bill. The representative also advised Mr. Gray that he was not the only one in this situation.

99.    ***Facts regarding Plaintiff Gary Honbarger*** -- Blue Cross represented to Mr. Honbarger that he had coverage through September 30, 2017, in its certification it gave him dated September 27, 2019. By that date, however, September 27, Blue Cross knew or should have known that payment and funding from Durafiber was not forthcoming.

100.    On information and belief, Mr. Honbarger incurred medical bills that were covered but that Blue Cross has declined to pay, and that it would have paid had Blue Cross taken steps to

32

ensure that the employer and self-funding entity had adequate funds allocated to pay claims, replenish the relevant bank account and keep the plan from being illusory.

101. ***Facts regarding Plaintiff Crystal Reese*** -- Crystal Reese began her employment with Durafiber on or about September 2, 2014. She worked there until the plant shut down on September 12, 2017. Her job duties included handling personnel files, reviewing resumes and other office duties. She would typically work from 7:30 a.m. to 4:00 p.m. with a lunch break.

102. In July 2017, Ms. Reese attended a large company meeting. She was advised that the plant would shut down and that there would be no health benefits after October 1, 2017. Ms. Reese received similar notification in the form of the form letter being sent to plant workers. She received similar confirmation from Blue Cross.

103. Ms. Reese has out-of-pocket medical expenses amounting to $27,000 or more for medical care which was covered according to her benefits booklet. The care occurred in the September 25 to 28, 2017 time period. Ms. Reese reasonably relied on assurances that the costs associated with this care were covered under her insurance as reflected by her Blue Cross subscriber ID card and benefit booklet. On information and belief, but-for Blue Cross' failure to ensure that Durafiber had adequate funds to self-fund the plan, her care would have been paid for.

104. Crystal Reese has more recently been impeded in obtaining medical care from one or more providers because of the outstanding medical bills. Ms. Reese had every right to rely on her group health medical coverage to cover those medical bills.

105. ***Facts regarding Plaintiff Monica Raney*** -- Monica Raney was employed at Durafiber where she performed a variety of office activities. Ms. Raney received the notification letter in July 2017 that other workers received representing to them that while the plant was going to close in the coming months, they had insurance coverage until September 30.

33

106. She received with her medical provider advance approval and precertification from Blue Cross for medical care which she received prior to the September 30, 2017 coverage cutoff. However, subsequently, the payment by the plan of her medical costs and doctors' bills was delayed. When she telephoned the Blue Cross representative in that regard, she was told words to the effect of that Blue Cross was working on it. She was also told words to the effect of that some claims had been paid and some had not been paid.

107. The failure of Blue Cross to properly administer the group health coverage and ensure that her medical charges were paid has caused damage to Ms. Raney's family. Ms. Raney and her husband, who also worked at the Salisbury plant, had longstanding plans to move to a new home. Ms. Raney had excellent credit until the lack of payment of her medical bills injured her credit rating through no fault of her own. She and her husband had to make other arrangements to obtain the bank loan they needed to proceed with their plans.

108. *Facts regarding Plaintiffs Tommy and Viola Ellis* -- Tommy Ellis worked at the Salisbury fiber plant from September 7, 1976 onward. He started out in the spin draw department as an operator, then worked as a first-class operator. In or about August 1986, he was promoted to supervisor of spin draw, and in 1990 he moved to another area. He was a longtime, reliable, dedicated worker at the plant.

109. Mr. Ellis continued working at the plant until February 9, 2018. When the Salisbury plant shut down in mid-September 2017, Mr. Ellis was kept on through the end of the month and into October 2017. He continued work after the October 6, 2017 bankruptcy filing of various Durafiber entities. He was with a remaining staff that grew smaller over time. Mr. Ellis did not finally leave work at the plant until February 2018.

110.    As the end of September 2017 approached, which was the purported cut-off date of the Blue Cross insurance, Durafiber and BCBS continued his insurance. He received a newly issued Blue Cross Blue Shield wallet card that stated, "dated issued: 10/01/17" under "Durafiber Technologies Group No. 012526." This is the same group number identified in paragraph 38, *supra.* This insurance card also listed his wife, Plaintiff Viola Ellis, as a member under that coverage. Mr. Ellis' receipt of this card verified verbal assurances that both he and his wife would continue to have the benefit of their Blue Cross insurance. Blue Cross issued this card with knowledge that the majority of similarly situated Durafiber employees had been terminated in mid-September 2017, which was a preface to Durafiber's bankruptcy filing.

111.    Viola Ellis began work with Durafiber in February 1998 as a production operator and in 2010 was promoted to lead operator. Mrs. Ellis' employment with Durafiber was terminated in September 2017, as Durafiber management and FTI prepared to take Durafiber into bankruptcy. Mrs. Ellis continued to have insurance coverage under the Durafiber Technologies Group No. 012526 plan as Mr. Ellis' spouse.

112.    The Ellises incurred medical bills during the period under which they were assured that they continued to have the Blue Cross coverage. These medical bills included significant medical expenses for Mrs. Ellis, who was diagnosed and treated for a serious medical illness including during the September and October 2017 time period and thereafter. During this time period, Blue Cross had indisputable knowledge that the Durafiber companies were in bankruptcy. *See, e.g.,* No. 17-12143-CSS, Doc. 129-1, filed 12/21/17 (D. Del. Bankr.) listing Blue Cross and Blue Shield – NC as Notice Recipients in the October 6, 2017 Durafiber bankruptcy).

113.    Mrs. Ellis incurred medical bills for medical care which she and her husband understood to be covered. Blue Cross knowingly induced them to believe they had coverage and

35

to act in reasonable reliance on that fact, leading to medical bills which they understand exceed tens of thousands of dollars in unpaid bills.

114. Prior to this turn of events, Mr. and Mrs. Ellis had a good credit score. Due to the events described above, their credit score has been damaged.

115. In response to requests for plan information to reflect the status of their medical benefit claims with Blue Cross and the reasons why coverage was denied, Blue Cross has provided spreadsheet information. However, that information is incomprehensible and fails to shed light on why Blue Cross failed to conduct its plan administrative duties in such a manner as to ensure payment of the benefits, or, to advise Mr. and Mrs. Ellis as the plan participants, to whom a fiduciary duty is owned, in a reasonable manner, that in fact they could not rely on the coverage card that Blue Cross issued to Mr. Ellis on October 1, 2017.

116. Rather than providing clear and useful information, the spreadsheet that Blue Cross has provided includes numerous field entries stating "unknown."

117. Under the circumstances, all Plaintiffs either make claims for which exhaustion of administrative remedies is not required, or, has been waived, or, is otherwise inapplicable.

### D. Additional facts regarding Defendants Papa, Bette and FTI.

118. On information and belief, Defendants Papa and Bette, following the cost strategy set by FTI, during the relevant period of time wrongfully declined to pay claims of not only vendors but also health plan benefit claimants; at various times they chose certain smaller claims to pay while stalling on others; and they treated claims in a preferential manner as opposed to paying or denying them based on the terms of the group health plan.

119. Papa and Bette have specialized experience and expertise in managing, building, and bankrupting businesses in the industrial fiber industry. They do not hold themselves out

36

professionally as having specialized expertise in applying ERISA, reviewing medical benefit claims in light of group health plan provisions, or making benefit determinations.

120.    In 2017, Defendants Papa and Bette had been planning to position part of the enterprise to go into bankruptcy, while selectively arranging matters such that Papa and Bette would move from being CEO and CFO of Durafiber to being the owners of Straterra Holdings, which along with PolyQuest, Inc. would form Fiber Innovators International, LLC, which in turn would acquire the former DuraFiber facility in Grover, N.C. near Shelby.

121.    On information and belief, during pertinent times, Papa and Bette selectively arranged to have payments made under the medical plan to cover medical care received by certain employees at the Shelby plant, because they sought to preserve goodwill and continuity of employment of workers they desired to retain once they obtained control over the Shelby plant via the Straterra arrangement.

122.    FTI was retained by Sun Capital Partners in or about June 2017 to assume the role of Chief Restructuring Officer with regard to the deteriorating situation at Durafiber.

123.    Over time, according to its own subsequently published promotional public relations materials, FTI took on duties including the responsibility of managing vendor relationships, developing a weekly cash flow forecasting model, taking a lead role in general financial and operational strategy and execution, and assisting in the public presentation of the wind-down of the business, including WARN Act notifications to all the hourly employees at Durafiber's manufacturing facilities.

124.    According to Defendant Bette, during the 2017 phase, "[t]he most important factor to control and assess was the cashflow forecasting which FTI Consulting proved to handle rapidly

37

and very accurately. They became a valued intermediary between the shareholders and third-party lenders, as well as a trusted consulting partner for the executives within the company."

125.    Taking FTI's and Bette's statements at face value as to why it was hired by the Durafiber owner, private equity firm Sun Capital, FTI is jointly and severally liable with the other Defendants due to its failure to ensure that its "cashflow forecasting" including making adequate provision to pay the worthy claims of plan participants.

## FIRST CAUSE OF ACTION
## ERISA – BREACH OF FIDUCIARY DUTY

126.    Plaintiffs incorporate by reference the factual allegations in the preceding paragraphs.

127.    This claim is asserted against Defendants Blue Cross, Papa, Bette and FTI as *de facto* and functional ERISA fiduciaries and as co-fiduciaries.

128.    Each Plaintiff is a plan participant under 29 U.S.C. § 1002(7) and/or a beneficiary under 29 U.S.C. § 1002(8).

129.    The group medical benefit plan herein under which enrollment wallet cards were issued to plan participants by Blue Cross Blue Shield is an "employee benefit plan" under 29 U.S.C. § 1002(3) and an "employee welfare benefit plan" under 29 U.S.C. § 1002(1).

130.    Every employee benefit plan shall be established and maintained pursuant to a written instrument. Such instrument shall provide for one or more named fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan. 29 U.S.C. § 1102(a)(1).

131.    Under ERISA, the term "named fiduciary" means a fiduciary who is named in the plan instrument, or who, pursuant to a procedure specified in the plan, is identified as a fiduciary

38

(A) by a person who is an employer or employee organization with respect to the plan or (B) by such an employer and such an employee organization acting jointly. 29 U.S.C. § 1102(a)(1).

132.    On or about June 27, 2017, Blue Cross issued to Durafiber Technologies (DFT) Group, Inc., Group Number 012526, what it entitled as a "Benefit Booklet For Employees of DURAFIBER TECHNOLOGIES (DFT) GROUP, INC. for Blue Options HSA." (the "2017 Benefit Booklet").

133.    This 2017 Benefit Booklet stated that it described the "Durafiber Technologies (DFT) Group, Inc. employee benefit plan." It added that "[t]he benefit plan described in this booklet is an EMPLOYEE health benefit plan, subject to the Employee Retirement Income Security Act of 1974 (ERISA)."

134.    This 2017 Benefit Booklet stated that it was a summary plan description in accordance with 29 U.S.C. § 1022.

135.    This 2017 Benefit Booklet stated that the plan sponsor under 29 U.S.C. § 1002(16)(B) was Durafiber Technologies (DFT) Group, Inc.

136.    This 2017 Benefit Booklet stated that the "plan administrator" under 29 U.S.C. § 1002(16)(A) was Durafiber Technologies (DFT) Group, Inc.

137.    This 2017 Benefit Booklet stated that the benefits provided by the plan consisted of "Medical Insurance."

138.    The 2017 Benefit Booklet states, as to "Type of PLAN Administration," that [t]he general administration of the PLAN is provided by the PLAN SPONSOR under Policy Number 012526 issued to the PLAN SPONSOR by Blue Cross and Blue Shield of North Carolina."

39

139. The 2017 Benefit Booklet states that "[t]he PLAN ADMINISTRATOR will provide notice to MEMBERS within sixty days of the adoption of any amendment that results in a material reduction in COVERED SERVICES or benefits."

140. In this case, the conduct of Defendants reflected a *de facto* amendment reducing benefits, which was not timely communicated to the participants, and for which lapse all Defendants, as *de facto* fiduciaries, are jointly and severally liable.

141. During the pertinent times, it was Blue Cross who managed the website by which a participant could "look at your plan, check benefits, eligibility, and claims status, download forms, manage your account, ask for new ID CARDS, get helpful wellness information and more," as per the 2017 Benefit Booklet.

142. During the pertinent times, it was Blue Cross who the participant was to contact with questions as to benefits, claims, or for a new ID Card; they were instructed by Blue Cross to call "BCBSNC Customer Service: 1-877-275-9787 … [f]or questions about your benefits, claims, new ID CARD requests or to voice a complaint," as per the 2017 Benefit Booklet.

143. During the pertinent times, for some medical procedures, the 2017 Benefit Booklet instructed the participant that Blue Cross would pre-certify the procedure: "Some services need PRIOR REVIEW and CERTIFICATION from BCBSNC. Up-to-date information about which services may need PRIOR REVIEW can be found online at BlueConnectNC.com." The booklet also states that "[c]ertain services require PRIOR REVIEW and CERTIFICATION by the PLAN in order to receive benefits." Elsewhere it adds, "[c]ertain services require PRIOR REVIEW and CERTIFICATION in order for you to avoid a full denial of benefits." It does not add that even if Blue Cross pre-certifies the procedure, Blue Cross has done no due diligence nor made any

40

arrangements with Durafiber (such as requiring a claims account to be funded to a certain level, or other security) to ensure the benefits will be paid.

144.    The 2017 Benefit Booklet further states that "[t]o make sure you can have high quality, cost-effective health care, BCBSNC has a UTILIZATION MANAGEMENT (UM) program. The UM program requires certain health care services to be reviewed and approved by BCBSNC in order to receive benefits. As part of this process, BCBSNC looks at whether health care services are MEDICALLY NECESSARY, given in the proper setting and for a reasonable length of time." In making this representation that it performs due diligence work to ensure high-quality cost-effective care, Blue Cross reasonable also leads a participant to believe that Blue Cross would undertake reasonable steps to ensure it does not pre-approve, pre-certify and authorize care, when the funds will not exist to pay for the care.

145.    Under the 2017 Benefit Booklet, medical claims were to be sent to Blue Cross. Prescription drug claims were to be sent to Blue Cross.

146.    Under the 2017 Benefit Booklet, the "benefit period" was from January 1, 2017 through December 31, 2017. The booklet stated that this was the "period of time … during which charges for COVERED SERVICES, provided to a MEMBER must be INCURRED in order to be eligible for payment by the PLAN. A charge shall be considered INCURRED on the date the service or supply was provided to a MEMBER." All the relevant medical claims herein and charges herein were timely under this provision.

147.    The 2017 Benefit Booklet cautions that "[c]laims not received within 18 months from the service date will not be covered, except in the absence of legal capacity of the MEMBER." All relevant claims herein were made within that deadline.

41

148.    The 2017 Benefit Booklet states that "[u]nder the PLAN, BCBSNC may pay a PROVIDER directly." And, that "BCBSNC has the authority to use its discretion to make reasonable determinations in the administration of coverage. These determinations will be final. Such determinations include decisions concerning coverage of services, care, treatment or supplies, and reasonableness of charges."

149.    The 2017 Benefit Booklet states that "BCBSNC will honor a CERTIFICATION to cover medical services or supplies under the PLAN unless the CERTIFICATION was based on: A material misrepresentation about your health condition[;] You were not eligible for these services under the PLAN due to cancellation of coverage (including your voluntary termination of coverage)[; or] Nonpayment of premiums." It does not state that after services were provided to the participant or the beneficiary, if Blue Cross later decides to terminate its involvement in the plan due to not being paid adequately by the employer and plan sponsor, this means Blue Cross can reach back and retroactively treat medical care that it pre-approved as actually being non-eligible. Also, the booklet states that a covered "member" is "[a]n EMPLOYEE or DEPENDENT, who is currently enrolled in the PLAN and for whom premium is paid." Here, the Plaintiffs all kept paying their premiums through the last day of their employment. For each one of them, their "premium [was] paid," thereby entitling them to coverage and benefits.

150.    The 2017 Benefit Booklet reflects a reality in which Blue Cross engages in all of the normal discretionary and fiduciary activities of a plan administrator. The sole difference is that Blue Cross also has a right to demand that the employer either send it funds to pay claims, or, send it funds to replenish a bank account that Blue Cross pays claims out of, or, send it funds to reimburse Blue Cross after Blue Cross pays claims.

42

151.   Stated differently, under the terms of the summary plan description, and in normal plan performance, the employer simply sends funds to Blue Cross when instructed.  It is Blue Cross, not the employer, who takes in claims, processes claims, pre-certifies, decides whether to declare medical services covered or not, determines what is owed to the service provider and pay that provider in the first instance.  Included in these administrative services are the discretionary duties of a fiduciary under ERISA.  Blue Cross knew, or should have known, that in the case of this group plan, Durafiber lacked the staff or expertise to evaluate and process medical claims.  When on information and belief the time came when Durafiber began selectively instructing Blue Cross to pay some claims but not others, to pay small claims but not big ones, or to pay Shelby plant claims but not Salisbury, Blue Cross knew or should have known that this was aberrant and improper behavior, and behavior that a party with fiduciary duties was obligated to investigate with an eye toward protecting participants and beneficiaries.

152.   The SPD expressly provided that Blue Cross, not Durafiber, would evaluate and approve or deny claims.  To the extent that Blue Cross allowed Durafiber to instruct it to not pay certain claims in a timely manner, this was a violation of the SPD terms.

153.   The 2017 Benefit Booklet stated that the "employer" was "DURAFIBER TECHNOLOGIES (DFT) GROUP, INC." and that an eligible employee was someone "who is eligible for coverage under the PLAN due to employment with the EMPLOYER and who is enrolled for coverage."  None of the Plaintiffs herein worked for that particular Durafiber entity, and yet, the plan covered them, further reflecting the minimal role of the "employer" as compared to Blue Cross.

154.   Under the circumstances, each Defendant was a fiduciary because each fell within the definition provided by ERISA, that is, "(i) he exercises any discretionary authority or

43

discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A)(i).

155.    The Defendants were all fiduciaries with respect to the plan and owed fiduciary duties to the participants and beneficiaries under ERISA.

156.    Under 29 U.S.C. § 1132(a)(2) and 29 U.S.C. § 1109, the Plaintiffs have standing to bring a claim for breach of fiduciary duty and to seek appropriate relief.

157.    As fiduciaries, Defendants were required by 29 U.S.C. § 1104(a)(1), to manage and administer the group health benefits and their duties regarding same "solely in the interest of the participants and beneficiaries and— (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." They were obligated to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. 29 U.S.C. § 1104(a)(1)(B). They were obligated to discharge their duties "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III" of ERISA. 29 U.S.C. § 1104(a)(1)(D).

158.    Defendants during the pertinent times were under 29 U.S.C. § 1105(a)(1) liable for the breach of co-fiduciary duties, in that they on information and belief knew that the conduct then occurring with regard to valid benefit claims for payment of medical charges, and the delay and refusal to pay such claims, was a known act or omission that breached fiduciary duties, yet

44

Defendants failed to inform participants and either participated in the unlawful conduct or participated in concealing it from participants.

159. Defendants during the pertinent times were under 29 U.S.C. § 1105(a)(2) liable for the breach of co-fiduciary duties, alternatively, because due to their failure to comply with section 1104(a)(1) in the administration of each one's specific responsibilities which gave rise to their status as a fiduciary, each enabled the other fiduciaries to commit a breach.

160. Defendants during the pertinent times were under 29 U.S.C. § 1105(a)(3) liable for the breach of co-fiduciary duties, alternatively, because each had knowledge of a breach by one or more of the other fiduciaries and failed to make reasonable efforts under the circumstances to remedy the breach.

161. Under ERISA, the individual Defendants Papa and Bette and the Defendant FTI were permitted to have fiduciary functions delegated to them under 29 U.S.C. § 1108(c)(3), but nonetheless had the same exacting duty to act solely in the interest of participants and beneficiaries, as is held by other fiduciaries.

162. The Defendants have breached fiduciary duties owed under ERISA by failing to ensure funds existed to timely pay claims; by failing to provide accurate and truthful information to plan participants; by acting improperly to benefit certain participants at the expense of others, by acting in derogation of the terms of the SPD; and otherwise as the evidence may show.

163. Blue Cross seeks to eliminate or mitigate its duties as an ERISA fiduciary by contending that it had only a minimal plan administrative role in connection with the insurance coverage. Yet its name and logo were prominent on the insurance card it sent all group coverage individual subscribers, and laypersons associate Blue Cross with dominance and comprehensive insurance services. Plaintiffs allege that Blue Cross had fiduciary duties under ERISA with regard

to the group coverage at issue herein. Plaintiffs allege that Blue Cross breached its fiduciary duties thereby proximately causing harm to the Plaintiffs and the putative class.

164. As a fiduciary, each Defendant was required under 29 U.S.C. § 1104(a)(1) to administer the Plan in the sole interest of participants and beneficiaries and for the exclusive purpose of providing benefits. The law requires an ERISA fiduciary to speak honestly and forthrightly with participants and beneficiaries. Fiduciaries are required to provide accurate and truthful information to participants and beneficiaries.

165. 29 U.S.C. § 1104(a)(1) also requires ERISA fiduciaries to discharge their duties with the care, skill, prudence and diligence that a prudent person acting in like capacity and familiar with the operation of a defined benefit would exercise. A fiduciary that negligently carries out his or her duties under the plan violates Section 404's standard of reasonable care. The duty of reasonable care also assumes that the fiduciaries will diligently act to correct problems that may jeopardize the interests of participants/beneficiaries. Here, the Defendants breached their fiduciary duties by misleading employees about the status of the plan and whether it could and would pay covered claims. Additionally, the Defendants have breached standards of care in the manner that they have administered the plan.

166. The Defendants breached the duty of reasonable care when they allowed the plan to operate in violation of ERISA. The Defendants failed to correct, among other things, (a) the problems related to claims coverage and payment under the plan; and (b) problems related to plan participants being assured the plan would cover costly treatment, inducing them to make appoints for and receive such treatment, only to learn later that Blue Cross would refuse to pay the claims even though they were covered claims.

46

167.    As a direct and proximate result of Defendants' breaches of fiduciary duty, the Plaintiffs and other class members were damages and injured.

168.    Under 29 U.S.C. § 1109(a), the fiduciary Defendants, upon proof that any have breached any of the responsibilities, obligations, or duties imposed upon fiduciaries by ERISA, should be found personally liable to make good to the plan any losses to the plan resulting from each such breach, and to restore to the plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate.

169.    Plaintiffs and other similarly situated participants are entitled to the declaration that the Defendants pay restitution to the participants.  Plaintiffs further are entitled to this Court appointing an independent auditor (at Defendants' cost) to review the plan and all participant accounts thereunder, including but not limited to, the history of premiums or participant contributions deducted from their paychecks, and claim approvals and denials.

## SECOND CAUSE OF ACTION
## ERISA – CLAIM FOR BENEFITS UNDER PLAN

170.    Plaintiffs incorporate by reference the factual allegations in the preceding paragraphs.

171.    This claim is asserted against Defendants Blue Cross, Papa, Bette and FTI as jointly and severally liable tortfeasors who each is alleged to have had sufficient direct involvement in the underlying malfeasance to be found liable.

172.    Under 29 U.S.C. § 1132(a)(1)(B), a participant or beneficiary may bring a claim to recover benefits due to him under the terms of the plan.

173.    Here, the Plaintiffs had a right to payment of medical benefits and medical provider charges during the pertinent times.

47

174.    Defendants jointly and severally while knowing that the claims of the Plaintiffs were proper and eligible for coverage under the plan, nonetheless failed to timely provide the benefits and pay for the claims.

175.    Under the circumstances, the Defendants should be held jointly and severally liable to pay compensatory damages reflecting the charges that were not paid and any related monetary damages or equitable relief as is deemed appropriate to award.

### THIRD CAUSE OF ACTION
### ERISA – CLAIM FOR EQUITABLE RELIEF

176.    Plaintiffs incorporate by reference the factual allegations in the preceding paragraphs.

177.    This claim is asserted against Defendants Blue Cross, Papa, Bette and FTI as jointly and severally liable tortfeasors who each is alleged to have had sufficient direct involvement in the underlying malfeasance to be found properly subject to imposition of equitable relief.

178.    Under 29 U.S.C. § 1132(a)(1)(B), a participant or beneficiary may bring a claim to to enjoin any act or practice which violates pertinent provisions of ERISA or the terms of the plan, or to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce pertinent provisions of ERISA or the terms of the plan.

179.    Plaintiffs are entitled to an award of appropriate equitable relief issued by the Court, including for an accounting of the performance, conduct, and financial transactions related to the plan during 2017, for reformation, restitution or disgorgement, and/or to enforce the provisions of the plan, particularly those requiring payment of the claims and charges herein.

48

180.     Under the circumstances, Blue Cross failed to perform its duties for which it was being paid as an administrator, competently or in accordance with its fiduciary duties.

181.     Blue Cross was aware, or reasonably should have known, during the relevant 2017 time period, that plan participants were up to date and current in paying-in their premiums, aka contributions, toward the plan coverage; this fact would reasonably induce participants to believe their benefits were properly funded; yet Blue Cross failed to take reasonable steps either to ensure the funding did exist and would exist over the course of time that providers would bee seeking payment of medical charges for care provided, or to accurately advise participants that despite their payment of premiums, they would not have their claims paid.

182.     Under the circumstances, the Court should order that all sums received by Blue Cross in payment for its purported administrative services should be disgorged and refunded to plan participants.

## FOURTH CAUSE OF ACTION
## COBRA CONTINUATION COVERAGE

183.     Plaintiffs incorporate by reference the factual allegations in the preceding paragraphs.

184.     This claim is asserted against Defendant Blue Cross.

185.     ERISA was amended by the Consolidated Omnibus Budget Reconciliation Act of 1985, 29 U.S.C. § 1161 *et seq*. ("COBRA") to afford employees at risk of losing health coverage due to specific "qualifying events" the opportunity to elect "continuation coverage."

186.     Under 29 U.S.C. § 1163(2), a qualifying event includes the termination (other than by reason of gross misconduct) of the covered employee's employment.

187.     In its role as functional plan administrator, Blue Cross purported to offer information to plan participants regarding their COBRA continuation rights. See 2017 Benefit

49

Booklet, at p. 73 ("Review this Summary Plan Description and the documents governing the PLAN on the rules governing your COBRA continuation coverage rights.").

188.   In offering information on plan provisions and benefits to plan participants, Defendant had a duty to offer accurate and complete information.

189.   Under the circumstances, Plaintiffs were entitled to be informed by Blue Cross of COBRA continuation rights, including that while the coverage ended for many participants as by the end of September 2017, it actually continued for others such as Mr. Ellis, as discussed above.

190.   COBRA provides a right to purchase extended health coverage under a plan. Here, Defendant failed to advise any other Plaintiffs or class members that the benefit plan was continuing for Mr. Ellis nor did it offer them the ability to participate in it.

191.   Under 29 U.S.C § 1162(2)(b), the coverage was to be extended through, *inter alia,* "[t]he date on which the employer ceases to provide any group health plan to any employee." Here, that date was not September 30, 2017, as believed by rank-and-file employees and participants, but rather, such later date that employees like Mr. Ellis ceased to be provided benefits.

192.   Defendant, as the functional administrator of the plan, had a duty under 29 U.S.C. § 1166(a) to notify the beneficiaries of their rights in this regard, but did not.

193.   The duty to provide COBRA notification is a fiduciary responsibility.

194.   Under the circumstances, Blue Cross failed to perform its duties for which it was being paid as an administrator, competently or in accordance with its fiduciary duties, with regard to issues of COBRA coverage.

195.   Blue Cross had actual knowledge that the plan was continuing as to Ellis on and after October 1, 2017; that other participants believed the plan ended on September 30, 2017; and

50

that therefore either Ellis or other participants and Plaintiffs were misinformed, but did not act to correct this state of affairs.

196. As a direct and proximate result of Defendant's failure to abide by its fiduciary duties with regard to COBRA coverage, the Plaintiffs were damaged.

## FIFTH CAUSE OF ACTION
## UNFAIR AND DECEPTIVE TRADE PRACTICES

197. Plaintiffs incorporate by reference the factual allegations in the preceding paragraphs.

198. This claim is asserted against Defendants Blue Cross, Papa, Bette and FTI as jointly and severally liable tortfeasors who each is alleged to have had sufficient direct involvement in the underlying malfeasance to be found liable.

199. The North Carolina Unfair and Deceptive Trade Practices Act provides that "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce are declared unlawful." N.C. Gen. Stat. § 75-1.1(a).

200. Under North Carolina law, a claim for unfair and deceptive trade practices may be based on the failure of a defendant to meet duties imposed for consumer protection by another statute. Defendant Blue Cross represented in its certification provided on September 27, 2017 for example, that this "evidence of your coverage" may be necessary to obtain special enrollment in another plan under HIPAA, i.e., the Health Insurance Portability and Accountability Act of 1996, Pub. L. 104-191 (H.R. 3103) (Aug. 21, 1996). While HIPAA does not offer a private right of action itself, evidence of HIPAA violations can be relevant to other claims. Here, Defendant's HIPAA-related statements in that certification were deceptive. Furthermore, during the period of time for which Defendant has refused to perform its duties under the insurance plan and accept

51

covered claims, Defendant continued to have and use sensitive and protected HIPAA information for the Plaintiffs and other subscribers.

201. Defendants' conduct in marketing the Blue Cross coverage and in managing and administering the coverage constitutes an unfair and deceptive act or practice under Chapter 75. Defendants engaged in unfair and deceptive practices including the following:

    a. Allowing Plaintiffs to be charged premiums without in fact providing them with coverage that paid on their medical claims;

    b. Paying or declining to pay benefit claims for unlawful reasons without so disclosing that fact to the Plaintiffs;

    c. Failing to properly monitor, investigate and audit the plan so as to ensure that it was intact, solvent and could satisfy claims;

    d. Failing to require or provide full and nondeceptive disclosure of the status of the plan; and

    e. other misconduct as may be evidenced at the trial of this matter.

202. Defendants' unfair and deceptive practices constitute unfair and deceptive acts or practices in or affecting commerce pursuant to N.C. Gen. Stat. § 75-1.1.

203. Defendants' conduct was unfair and deceptive and unconscionable given the unequal bargaining position of the consumer.

204. Defendants charged or allowed to be charged to Plaintiffs and the class insurance coverage and plan premiums and contributions while knowing that coverage did not exist leading the imposition of the premiums to be unconscionable.

205. As a direct result of Defendants' violations of law, Plaintiffs and the class members have suffered damages in the form of actual out-of-pocket losses due to the price of their medical care being higher and due to their medical charges not being covered by the plan.

52

206.     The sale of insurance is a consumer transaction within the meaning of trade or commerce. Defendants' practices set forth herein violate North Carolina law as illegal, unfair or deceptive acts or practices in the conduct of any trade or commerce because they are inherently deceptive.     The publication and distribution of deceptive and misleading material, the misrepresentations of material facts, and Defendants' other practices within the State of North Carolina all constitute unfair and deceptive actions undertaken in commerce.

207.     Defendants' practices offend established public policy and are unmoral, unethical, oppressive, or unscrupulous. Defendants' practices proximately caused harm to Plaintiffs and to the class, proximately caused harm to North Carolina consumers, and were deceptive in their effect upon an average consumer. The unfair and deceptive, negligent, willful and/or wanton acts and/or omissions of the Defendants herein, through its employees, servants and/or agents, contributed in whole or in part to the injuries and harm suffered by the Plaintiffs as alleged herein.

208.     By reason of the foregoing, Plaintiffs and the other members of the class have been actually damaged in an amount in excess of $25,000, to be proven at trial. The damages to the Plaintiffs and other members of the class should be trebled and Plaintiff should be allowed to recover attorneys' fees, pursuant to N.C. Gen Stat. § 75-16.

**SIXTH CAUSE OF ACTION**
**INJUNCTIVE AND DECLARATORY RELIEF,**
**UNJUST ENRICHMENT, RESTITUTION**

209.     Plaintiffs incorporate by reference the factual allegations in the preceding paragraphs.

210.     This claim is asserted against Defendants Blue Cross, Papa, Bette and FTI as jointly and severally liable tortfeasors who each is alleged to have had sufficient direct involvement in the underlying malfeasance to be found subject to imposition of equitable remedies.

53

211.     Pursuant to the Declaratory Judgment Act, N.C. Gen. Stat. § 1-253 *et seq.*, this Court has the power to declare rights, status and other legal relations, whether or not further relief is claimed. N.C. Gen. Stat. § 1-253. This Court furthermore has power to enter a declaratory judgment determining questions regarding the legal status of parties under any purported contracts or other writings. N.C. Gen. Stat. § 1-254. Further relief may be granted where necessary or proper. N.C. Gen. Stat. § 1-259.

212.     Defendants engaged in unconscionable, adhesive and void transactions, lacking assent of the consumer and insured. Defendants were unjustly enriched through their unlawful practices and class members are entitled to individual restitution.

213.     Defendants acted in an unconscionable manner and the contractual agreement by which they received premiums or plan contributions from the Plaintiffs should be deemed void, and against public policy, allowing Plaintiffs a right of restitution.

214.     Due to the Defendants' unjust and fraudulent misconduct, this Court should order and require that Defendants make restitution of all monies, funds and benefits received through the Defendants' wrongful conversion of funds intended for and owned by the Plaintiffs.

215.     Plaintiffs request that this Court order a complete accounting of all monies improperly diverted by the Defendants and order the imposition of a resulting or constructive trust to hold all such monies so that they may be properly redirected to the Plaintiffs. Each class member is entitled to entry of an Order requiring disgorgement of the monies unlawfully obtained by Defendants from the class member.

**SEVENTH CAUSE OF ACTION**
**BREACH OF CONTRACT**

216.     Plaintiffs incorporate by reference the factual allegations in the preceding paragraphs.

217. This claim is asserted against Defendant Blue Cross.

218. In the alternative, Plaintiffs allege that they agreed to a contract by which they would pay premiums for coverage by having deductions made from their paychecks. In return, they were entitled to receive coverage. They did not receive the coverage they bargained for, because Defendants breached their side of the bargain.

219. As a result of Defendants' breach of contract, Plaintiffs and all other class members have incurred damages.

## EIGHTH CAUSE OF ACTION
## FRAUD; FRAUDULENT CONCEALMENT

220. Plaintiffs incorporate by reference the factual allegations in the preceding paragraphs.

221. This claim is asserted against Defendants Papa and Bette as jointly and severally liable tortfeasors who each is alleged to have had sufficient direct involvement in the underlying malfeasance to be found liable.

222. Defendants were aware of the actual state of facts and misled Plaintiffs by not informing Plaintiffs of the actual state of facts. Upon information and belief, Defendants falsely represented or recklessly misrepresented information regarding the coverage and insurance payments to which Plaintiffs were entitled.

223. Upon information and belief, Defendants knew their misrepresentations were false and would deceive Plaintiffs and made such misrepresentations with the intent to deceive Plaintiffs. Defendants knew that Defendants were suppressing or concealing information, which if not disclosed, would create a false impression of fact in the minds of Plaintiffs.

55

224.    Plaintiffs were, in fact, deceived by Defendants' misrepresentations.  Plaintiffs acted in reasonable reliance upon the false impression of fact created by the suppression or concealment of information.  Defendants' misrepresentations damaged Plaintiffs.

225.    Defendants suppressed or concealed one or more material facts from the Plaintiffs including that Defendants knew or were in reckless disregard of the fact that the plan would not in fact cover and pay claims that the Defendants were inducing the Plaintiffs to make and incur by promising that coverage exited.

226.    Suppression or concealment of this material fact created a false impression of fact in the minds of Plaintiffs.  Defendants knew that they were suppressing or concealing information, which if not disclosed, would create a false impression of fact in the minds of Plaintiffs.

227.    Defendants intended the Plaintiffs to act upon the false impression of fact. Plaintiffs acted in reasonable reliance upon the false impression of fact created by the suppression or concealment of information.

228.    Plaintiffs sustained damage in an amount exceeding $25,000 as a proximate result of such reliance.

### NINTH CAUSE OF ACTION
### CONVERSION AND MISAPPROPRIATION OF FUNDS

229.    Plaintiffs incorporate by reference the factual allegations in the preceding paragraphs.

230.    This claim is asserted against Defendants Papa and Bette as jointly and severally liable tortfeasors who each is alleged to have had sufficient direct involvement in the underlying malfeasance to be found liable.

231. During the pertinent times, Defendants wrongful converted and misappropriated to Defendants' own use funds that were properly owned by the Plaintiffs, that is, the employee pay from which purported premium payments was wrongfully deducted.

232. Defendants wrongfully converted the funds owned by the Plaintiffs. During the pertinent times, the Defendants converted and misappropriated funds belonging to the Plaintiffs and used those funds for Defendants' own selfish purposes that did not benefit the Plaintiff.

233. Defendants' wrongful conversion and misappropriation of funds occurred without the consent or authority of the Plaintiffs.

234. Plaintiffs sustained damage in an amount exceeding $25,000 as a proximate result of Defendants' wrongful conversion and misappropriation of funds.

## TENTH CAUSE OF ACTION
## CONSTRUCTIVE FRAUD

235. Plaintiffs incorporate by reference the factual allegations in the preceding paragraphs.

236. This claim is asserted against Defendants Papa and Bette as jointly and severally liable tortfeasors who each is alleged to have had sufficient direct involvement in the underlying malfeasance to be found liable.

237. During the pertinent times, Defendants engaged in breaches of fiduciary duties that Defendants owed to the Plaintiffs with regard to the funds from their paychecks which the Defendants knew belonged to the Plaintiffs, and were to pay for their insurance coverage. Further, the Defendants knew that as a result of their plant closure and coverage announcements, many workers sought to obtain medical care that they otherwise would have gone without or delayed until later had they known they really did not have coverage that would pay for those charges.

238.	Because of Defendants' breaches of fiduciary duty, Defendants are liable for constructive fraud based upon a breach of a fiduciary duty. During the pertinent times Defendants stood in a relation of trust and confidence with regard to the Plaintiffs, and wrongfully exploited that relationship of trust and confidence to engage in the transactions recited herein in which Defendants took advantage of their position of trust and of fiduciary duty to commit multiple breaches of fiduciary duty and to directly benefit for those fiduciary breaches.

239.	Plaintiffs sustained damage in an amount exceeding $25,000 as a proximate result of Defendants' breach of fiduciary duty and constructive fraud.

## JURY DEMAND

Plaintiffs demand jury by jury on all such claims as are so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray, on behalf of themselves and other similarly situated plan participants, for judgment as follows:

A.	That the Court certify the proposed Rule 23 class with respect to the claims herein;

B.	That the Court pursuant to the Declaratory Judgment Act, N.C. Gen. Stat. § 1-253 *et seq.*, declare the rights, status and other legal relations, of the parties;

C.	That the Court award the Plaintiffs actual damages, in an amount to be determined at trial, for the wrongful and deceptive acts of the Defendants;

D.	That the Court order disgorgement and restitution from Defendants;

E.	That the Court order Defendants to forfeit wrongfully misappropriated and converted sums;

F.	That the Court order Defendants to pay Plaintiffs and plan participants lost benefits arising from the failure to properly pay covered claims;

G.	That the Court appoint an independent auditor, at Defendants' cost, to review the plan and all participant accounts thereunder, including but not limited to, the disposition of participant premiums and contributions;

58

H.    That the Court award reasonable attorney fees and costs to Plaintiffs' counsel;

I.    That the Court award the Plaintiffs pre-judgment and post-judgment interest; and

J.    For such other and further relief as this Court may deem just and proper.

A JURY IS RESPECTFULLY DEMANDED TO TRY THESE ISSUES.

Respectfully submitted this the 6th day of December, 2019.

Mona Lisa Wallace, N.C. State Bar No. 9021
John Hughes, N.C. State Bar No. 22126
Wallace & Graham, P.A.
525 N. Main Street
Salisbury, NC 28144
Phone: 704-633-5244
Fax: 704-633-9434
mwallace@wallacegraham.com
jhughes@wallacegraham.com

59

## CERTIFICATE OF SERVICE

This first amended complaint is certified by the undersigned to have been postmarked and deposited in US first class mail on the date of December 6, 2019, directed to the following recipients:

- Blue Cross and Blue Shield of North Carolina, d/b/a BlueCross BlueShield of North Carolina, c/o registered agent address of c/o 4613 University Drive, Durham, NC 27707
- Blue Cross and Blue Shield of North Carolina, d/b/a BlueCross BlueShield of North Carolina,1830 US 15-501 North, Chapel Hill NC 27514
- Frank Papa c/o CORE Industrial Partners, 150 N. Riverside Plaza, Suite 2050, Chicago, IL 60606
- Frank Papa, 103 Avenue of the Estates, Cary NC 27518-8608.
- Erwin Bette c/o Fiber Innovators International, 2525 Blacksburg Rd, Grover, NC 28073
- Erwin Bette, 128 Seabury Drive, Mooresville NC 28117-6045
- Erwin Bette c/o CORE Industrial Partners, 150 N. Riverside Plaza, Suite 2050, Chicago, IL 60606
- FTI Consulting, Inc. c/o registered agent, 160 Mine Lake Ct Ste 200, Raleigh, NC 27615-6417
- FTI Consulting, Inc. 16701 Melford Blvd. Suite 200, Bowie, MD 20715
- The Group Health Plan for Employees of Durafiber Technologies (DFT) Group, Inc., 13620 Reese Blvd., Suite 400, Huntersville, NC 28078
- The Group Health Plan for Employees of Durafiber Technologies (DFT) Group, Inc., c/o Blue Cross and Blue Shield of North Carolina, 4613 University Drive, Durham, NC 27707
- The Group Health Plan for Employees of Durafiber Technologies (DFT) Group, Inc., c/o Blue Cross and Blue Shield of North Carolina, 1830 US 15-501 North, Chapel Hill NC 27514

Respectfully submitted this the 6th day of December, 2019.

Mona Lisa Wallace, N.C. State Bar No. 9021
John Hughes, N.C. State Bar No. 22126
Wallace & Graham, P.A.
525 N. Main Street
Salisbury, NC 28144
Phone: 704-633-5244
mwallace@wallacegraham.com
jhughes@wallacegraham.com